UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SUSANNE SHARP, o/b/o F.S., | ) | CASE NO. 1:13CV2062 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE GEORGE J. |
| | ) | LIMBERT |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | **MEMORANDUM OPINION AND** |
| ACTING COMMISSIONER OF | ) | **ORDER** |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Susanne Sharp ("Plaintiff"), acting on behalf of F.S. ("Claimant"), a minor (d.o.b. - December 10, 1999) and Plaintiff's son, seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying Claimant's Supplemental Security Income ("SSI") claim. ECF Dkt. #1. For the following reasons, the ALJ's decision is AFFIRMED and the instant case is DISMISSED with prejudice:

I.     **PROCEDURAL HISTORY**

On November 4, 2010, Plaintiff, acting on behalf of Claimant, filed an application for children's SSI, alleging disability beginning December 1, 2008, due to Claimant's behavioral problems. ECF Dkt. #12 ("Tr.") at 129-141. The application was denied initially and on reconsideration. *Id.* at 51-75.

Plaintiff filed a request for an hearing and on July 3, 2012, an Administrative Law Judge ("ALJ") conducted a hearing *via* video conference, where Plaintiff and Claimant appeared and were represented by counsel. Tr. at 33-54. At the hearing, the ALJ accepted testimony from Plaintiff. *Id.* On July 27, 2012, the ALJ issued a Notice of Decision - Unfavorable. *Id.* at 14-31. Plaintiff requested review of the ALJ's decision to the Appeals Council, but on August 16, 2013, the Appeals Council denied Plaintiff's request for review. *Id.* at 1-5.

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

On September 17, 2013, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1.  On February 10, 2014, Plaintiff filed a brief on the merits.  ECF Dkt. #16.  On March 11, 2014, Defendant filed a brief on the merits.  ECF Dkt. #17.

## II.   RELEVANT MEDICAL/SCHOOL HISTORY

### A.   Hearing testimony

Plaintiff testified that she applied for SSI for Claimant, who was eight years of age on the date the application was filed and ten years of age at the time of the hearing, because of his behavior. Tr. at 40.  She explained that Claimant's school contacted her when he was in the third or fourth grade to report his "arguing and fighting," and to inquire as to whether he misbehaved at home. Plaintiff reported Claimant's problems at school to his primary care nurse practitioner, which resulted in the diagnosis of attention deficit hyperactivity disorder ("ADHD").  Tr. at 41.  As a result, Claimant began treating two days a week at Beech Brook, a counseling and treatment center for children.  Tr. at 42.  At the hearing, Plaintiff reported no improvement in Claimant's behavior as a result of his therapy at Beech Brook or his prescribed medication.  Tr. at 42-43.

Plaintiff testified that Claimant's temper is mercurial, he fights with sister, and he talks back to both of his parents.  Tr. at 44.  Plaintiff further testified that Claimant has one or two friends, but that he does not visit them because she keeps him at home to avoid trouble.  Tr. at 44.  Claimant sleeps with the aid of medication. Claimant refuses to bathe or change his clothes.  Tr. at 46.  She testified that she has to beg him to take out the garbage.  He plays video games all day long.  Tr. at 46.

According to Plaintiff, Claimant does not complete his homework, but he has never been held back in school. Tr. at 45. Plaintiff had not received Claimant's most recent report card because he was suspended at the end of the school year, and the report card was being sent through the mail. Tr. at 47.  Plaintiff testified that Claimant was going to get an "F" in social studies and "Bs and Cs" in his other courses.  Tr.  t 47.

### B.   Medical evidence

Claimant began treatment for ADHD at Beech Brook on November 22, 2008, when he was eight years of age.  Plaintiff was concerned about Claimant's behavior, and Claimant stated that he

needed help with his "attitude" and he was "fighting, getting angry, bullying." Tr. at 404. He was evaluated by Bridget Richard, LISW. Tr. at 402-414. Upon examination, he was dressed appropriately, fully oriented, his mood was pleasant, and his affect was happy. Tr. at 412. His appearance, safety concerns, intellectual functioning, speech, affect/mood, perceptions, and thought content were unremarkable. Tr. at 412. Ms. Richard explained that Claimant became distracted, interrupted his mother by being silly, and seemed to be seeking negative attention. Tr. at 412. She diagnosed ADHD, assigned a Global Assessment of Functioning ("GAF") score of 50, connoting moderate symptoms, recommended outpatient therapy and medication management, and placed Claimant on an Individual Service Plan ("ISP"). Tr. at 413.

Two days later, Claimant presented to Veronica Crowe-Carpenter, RN, his primary care nurse practitioner. Tr. at 465. At the time, Claimant was not yet on medication, but his parents expressed and interest in Ms. Crowe-Carpenter prescribing Concerta Tr. at 465. During his examination, he was healthy, alert, pleasant, and in no distress. Tr. at 465.

Claimant returned to Ms. Crowe-Carpenter in December of 2008 for a follow-up visit. Tr. at 463. He was not experiencing side effects from Concerta, 18 mg., but his school performance was still a problem. Tr. at 463. He had been suspended from school, and he was still combative and argumentative with his siblings. Tr. at 463. Although an increase in his dosage of Concerta was recommended, his parents chose not to increase the dosage.. Tr. at 463.

In February of 2009, Claimant returned to Beech Brook after he was suspended from school for argumentative and disrespectful behavior. Tr. at 424-429. Although Claimant had been making progress with treatment, his attention-seeking and aggressive behavior had increased in the previous two weeks. Tr. at 426. Despite his problems, his counselor acknowledged that Claimant was beginning to recognize his triggers for acting out, and she focused on interventions to help him with coping strategies to replace his aggressive and attention seeking behavior. Tr. at 426. Claimant was able to sit still and focus for appropriate periods of time. Tr. at 426. The following month, Claimant and Plaintiff acknowledged to Ms. Crowe-Carpenter that his medication helped him, and Plaintiff reported that Claimant's behavior at home improved, but not at school. Tr. at 455. Claimant spent his time playing with a computer and playing video games. Tr. at 455.

-3-

In March and April of 2009, Claimant underwent a multi-factored evaluation at school to determine whether he should be assigned to special education classes. Tr. at 155-191. Claimant's achievement scores were within normal limits, and he had only mild difficulties in reading comprehension. Tr. at 165. The school psychiatrist determined that factors other than academic skills may have been adversely affecting his ability to apply what he knew to classroom assignments and tests. Tr. at 165.

A WISC-IV test showed his IQ was borderline, but his verbal comprehension, perceptual reasoning, working memory, and processing speed were low average. Tr. at 171. In a behavioral observation of a school project, Claimant was off task 51% of the time, as opposed to his peers who were off task 3% of the time. Tr. at 303. Claimant attempted to seek attention and approval, but did so through negative comments, intimidation, or aggression, and as a result was rejected by other students. Tr. at 182. It was observed that Claimant was sexist and did not respect girls or women, and behaved better with a male teacher. Tr. at 186.

That same month, Claimant's third grade teacher, Ms. Mitchell completed a Teacher Questionnaire. Tr. at 145-152. In the domain of attending and completing tasks, she found that he had a very serious problem waiting to take turns, changing activities without being disruptive, and working without distracting himself or others. Tr. at 147. However, she found he had no problem in seven other categories, including paying attention when spoken to directly, sustaining attention during play and sports, focusing long enough to finish an activity, refocusing to a task when necessary, and carrying out single or multi-step instructions. Tr. at 147.

In the domain of caring for himself, she found that he had only one very serious problem – responding appropriately to changes in his own mood, and one serious problem – using appropriate coping skills to meet daily demands of school environment . Tr. at 150. Ms. Mitchell reported that Claimant was able to self-correct his mistakes, and could read "very well" when he took his time. Tr. at 166. He needed to improve his social and emotional skills, and although tutoring was offered, his parents did not accept the offer. Tr. at 166, 167. Ms. Mitchell observed that Claimant had very serious problems in the domain of interacting and relating to others, that is, he is unable to play cooperatively with other children, seek attention and express anger appropriately, follow rules,

-4-

respect authority, and taking turns in conversation.  Nonetheless,  Ms. Mitchell explained that Claimant could be "very successful" if he received anger management and understood the consequences of disrespectful behavior. Tr. at  187. She felt his ADHD "can be dealt with" if his "level of respect was improved & supported." Tr. at  188.

In April of 2009, Plaintiff reported to Ms. Crowe-Carpenter that Claimant's grades were poor but his home behavior was good, and she was unwilling to increase his medication. Tr. at 452. Ms. Crowe-Carpenter found that Claimant was healthy, alert, pleasant, and in no distress. Tr. at  453. That same month, his counselor at Beech Brook noted that Claimant's behavior at home showed "great improvement" with medication. Tr. at  417. Upon examination, he was very polite, mildly restless, cheerful, had some irritability when he did not get his way, but his thinking was clear and goal directed. Tr. at  417. His GAF score was 70, connoting transient and expectable reactions to psychosocial stressors.. Tr. at  417.

On April 23, 2009, Claimant underwent a pharmacological assessment at Beech Brook wherein it was reported that Claimant was currently taking 36mg of Concerta and 0.1 mg. of Clonodine at night. Tr. at 417. Claimant continued to have problems at school, including suspensions, aggression and defiant behavior, but his behavior was noted to be improved at home. Tr. at 417. Claimant was diagnosed with ADHD and Plaintiff was instructed to speak to Ms. Crowe-Carpenter concerning increasing the dosage of Claimant's ADHD medication to 54 mg.Tr. at 417.

In May of 2009, Sharon Mitchell, Claimant's teacher of seven months, completed a teacher questionnaire. Tr. at 144-154. Ms. Mitchell opined that Claimant had very serious problems waiting to take turns, changing from one activity to another, working without distracting others, playing cooperatively with others, seeking attention appropriately, expressing anger appropriately, following rules, respecting/obeying adults in authority, taking turns in conversations, demonstrating strength, coordination, dexterity in activities or tasks, showing a sense of body's location and movement in space and responding appropriately to changes in his own mood. Tr. at 144-150. Moreover, Ms. Mitchell stated that Claimant will generally allow teachers to redirect him but at times will let it be know that he does not have to do what is expected because "nothing will happen" because he "can do what he wants." Tr. at 148.

-5-

On September 10, 2009, Claimant presented to Ms. Crowe-Carpenter for treatment of boils. Tr. at 450. She noted that his school performance the year before was poor, but his mother was unwilling to increase his medication. Tr. at 450. Ms. Crowe-Carpenter also observed that Claimant was obese, having gained eleven pounds in five months. She recommended diet and exercise, and told Claimant's father that Claimant should be seen every three months.

Claimant underwent academic testing in the spring of 2010. Claimant's scores in the Clinical Evaluation of Language Fundamentals-4 test were either average, or one to one-and-a-half standard deviations below the mean, indicating mildly delayed/borderline abilities. Tr. at 345. None of his scores were two standard deviations below the mean. Tr. at 345. Claimant had "a relative weakness" in his ability to retain and follow multi-step oral directions.

In July of 2010, Claimant's ISP with Beech Brook was continued. Tr. at 472-80. Claimant worked well one-on-one and enjoyed talking about his interests. Tr. at 474. It was noted that Claimant had difficulty at the time because he had moved to a new home, was going to a new school and working with a new therapist, and there was a recent death in the family. Tr. at 478. Claimant had no safety concerns. Tr. at 480.

On October 20, 2010, during Claimant's fifth grade year, he returned to Ms. Crowe-Carpenter because of his behavioral problems. Tr. at 445. His mother stopped his medications over the summer, and his social worker at school requested that his medication be restarted. Tr. at 445. As a result, he was placed back on Concerta. Tr. at 445. By the next month, his school performance was improving, his home behavior was good, and he was healthy, alert, and pleasant. Tr. at 442.

On January 12, 2011, Ms. Crowe-Carpenter noted that Claimant's school performance was improving. Tr. at 495. He was behaving at home, except that he was quick-tempered. Tr. at 495. Ms. Crowe-Carpenter again addresses Claimant's weight problem (it was noted that he had gained fifty pounds in two years), recommending a heart-healthy lifestyle including aerobic exercise and dental hygiene. In April of 2011, although Claimant was suspended for fighting, fought with his siblings, and received a "D" in math, Plaintiff characterized Claimant as "doing fairly well." Tr. at 489. His therapist at Beech Brook noted that he had regressed and was having a difficult time

-6-

adjusting to his new school. Tr. at 512-13. Claimant's parents put a lock on the refrigerator in order to prevent him from sneaking food at night.

On April 29, 2011, Sally Boyd, Claimant's fifth grade special education math teacher completed a school questionnaire. Tr. at 334-335. Ms. Boyd reported that Claimant was in special education classes for math and language arts. Tr. at 334. He also received extended time and small group settings for testing. Tr. at 334. Ms. Boyd opined that Claimant needed improvement in attention and concentration in the classroom, working independently of teachers supervision, and responding to criticism. Tr. at 334. Claimant was also noted to have been suspended eight times for physical aggression or not following teacher directives, in the eight months that he had known Ms. Boyd. Tr. at 335.

In May of 2011, Ms. Crowe-Carpenter noted that Claimant's grades were good but his behavior was still an issue. Tr. at 522. She prescribed a trial of Intuniv for impulse control due to his behavioral problems, but Intuniv made Claimant more angry and he was suspended again for fighting. Tr. at 516, 522. As a consequence, Claimant discontinued Intuniv. Tr. at 516-17.

In August of 2011, during Claimant's sixth grade year, his counselor at Beech Brook reported that he had done a good job of managing his defiant and attention-seeking behaviors at home and at school, and he improved his ability to ignore, walk away, and talk to a parent/teacher when anger arises. Tr. at 536. Claimant's control over his angry behavior impacted his functioning. Tr. at 538. He had moments of poor anger management, but overall his behavior had improved. Tr. at 536.

In November of 2011, Claimant returned to Ms. Crowe-Carpenter. Tr. at 541. He was neatly dressed and groomed in an age-appropriate manner. Tr. at 541. His speech was normal, and he was neither elevated nor depressed, he was cooperative, and he followed instructions in an age-appropriate manner. Tr. at 541. She reported that his behavior had improved with Concerta.[2] Tr. at 544. Ms. Crowe-Carpenter's plan was simply "routine well child care; follow up as needed for illness." Tr. at 549.

---

[2]Ms. Crowe-Carpenter appears to use the proper name "Concerta" as a general term referring to psychostimulant medication, as Claimant's medication list reads "Vyvanse 30 mg." Tr. at 545.

An ISP review at Beech Brook the next month demonstrated that Claimant again exhibited poor behavior, but this was driven by his need to get attention in a negative way, and the fact that his family was moving to a new home. Tr. at 561-565. Six months later, at the end of the school year, another review at Beech Brook showed that Claimant's functioning was minimally improved. Tr. at 608. He had improved social skills with his peers, but had trouble using his social skills with his siblings and neighbors. Tr. at 608. Claimant had moved and switched schools again during the school year, and his parents' attention was focused on his sister's pregnancy. Tr. at 610. However, Claimant was "doing well" in his new school, and was making some new friends in the neighborhood. Tr. at 610. Claimant's sixth grade teacher, Tara Thomas, stated he was performing at grade level or "slightly below." Tr. at 336.

In June of 2012, Plaintiff reported to Ms. Crowe-Carpenter that Claimant completed sixth grade but was suspended three times for being disrespectful. Tr. at 617. Ms. Crowe-Carpenter found that Claimant was neatly dressed and groomed in an age-appropriate manner, his speech and eye contact were normal, his affect was appropriate, he was cooperative, and he followed instructions in an age-appropriate manner. Tr. at 617. She reported that he was over-eating and "drinking pop and juice to excess." Tr. at 617. A cardiologist encouraged Claimant to lose weight and attributed Claimant's hypertension to his weight and diet.

### C.    Assessments

On January 9, 2009, David V. House, Ph.D., performed a consultative psychological evaluation. Tr. at 395. Dr. House observed that Claimant did not set fires, was not cruel to animals, and was not a runaway threat. Tr. at 397. He was not engaged in any conflict with adult authority figures. Tr. at 397. Claimant also did not demonstrate tantrum behavior. Tr. at 397. He had never been to juvenile court or a psychiatric hospital. Tr. at 397. In his free time, Claimant enjoyed using the computer and watching television. Tr. at 397. He did homework but refused to perform chores. Tr. at 397. Plaintiff stated that she applied for disability because of Claimant's behavior problems. Tr. at 397.

Dr. House found that Claimant was appropriately dressed in clean attire Tr. at 397. He was broadly cooperative, and his concentration and attention were "mildly" inconsistent, but not limited.

Tr. at 397. His pace was adequate, he was persistent, and he was able to complete Dr. House's tasks. Tr. at 397. He tolerated frustration adequately, and responded appropriately to redirection. Tr. at 397. His speech was adequate and consistent with his age and educational expectations. Tr. at 397. Claimant stated he was mostly happy, but bored at times, and he had no episodes of excessive crying, no hallucinations, and no delusions. Tr. at 398. Claimant's modal score in IQ testing was in the low-average range. Tr. at 398. Dr. House concluded that Claimant performed at two-thirds of the functioning of an average child his age in the following categories: concentration, attention, pace, persistence, and task completion; social, emotional, and behavior patterns; verbal cognitive skills; non-verbal cognitive skills; and speech skills. Tr. at 399. Dr. House assigned a GAF score of 52, based upon moderate levels of behavior disturbance and moderate difficulties in chore accomplishment. Tr. at 400.

On August 28, 2009, Malika Haque, M.D., a reviewing state agency physician, completed a Childhood Disability Evaluation form. Tr. at 431-35. She determined that Claimant had a severe impairment, but his conditions did not meet, medically equal, or functionally equal a listing. Tr. at 430. She opined that Claimant had a marked limitation in the domain of interacting and relating with others, but did not have a marked or extreme limitation in any other domain. Tr. at 432-33.

On February 25, 2011, Jeff Rindsberg, Psy.D., a clinical psychologist, performed a consultative examination. Tr. at 482. He found that Claimant was casually and fashionably attired, appropriate to the weather. Tr. at 482. Dr. Rindsberg noted that Claimant had a fair degree of concern about his appearance, and his grooming was appropriate. Tr. at 482. Claimant was calm, polite, cooperative, and sat appropriately in his seat. Tr. at 483. There was no sign of inattention or distractibility, and he was not hyper. Tr. at 483. He was calm and polite, and did all that was asked Tr. at 483. Claimant reported having a normal mood and being happy. Tr. at 483. He had no history of cruelty to animals, fire setting, or weapons use. Tr. at 483. He cried only when he did not get his way. Tr. at 483. Dr. Rindsberg found that medication helped Claimant, but he still had some attention and concentration problems. Tr. at 483.

Dr. Rindsberg "saw no indication of serious underlying problems with attention or hyperactivity." Tr. at 483. Claimant denied attention and concentration problems, and stated he was

-9-

feeling better. Tr. at 484. Claimant was calm, polite, and reserved. Tr. at 484. Claimant was able to focus adequately for the evaluation, and there were "no difficulties with his ability to focus and remain attended to what he needed to focus on." Tr. at 484. He enjoyed watching television and playing videogames, and particularly enjoyed watching wrestling. Tr. at 484-85. Dr. Rindsberg found that Claimant's cognitive functioning was three-quarters age appropriate, and he was learning adequately at school. Tr. at 485. He stated that Claimant's concentration, persistence, and pace were one-half age appropriate, but with medication Claimant was able to focus adequately. Tr. at 485.

On March 8, 2011, Teresita Cruz, M.D., a reviewing state agency pediatrician, found that Claimant was not disabled. Tr. at 58, 60. She found that Claimant did not meet a listing, and had less than marked limitations in the domains of attending and completing tasks, and caring for himself. Tr. at 56-57. Similarly, on August 9, 2011, Rachel Rosenfield, M.D., a reviewing state agency pediatrician, found that Claimant was not disabled, did not meet a listing, and had less than marked limitations in the domains of attending and completing tasks and caring for himself. Tr. at 69-71, 74.

Ms. Crowe-Carpenter completed a form entitled "Questionnaire Health Care Professionals on Medical and Functional Equivalence" on three occasions – October of 2010 , Tr. at 437-440,n November of 2011, Tr. at 552-54, and June of 2012. Tr. at 578-80. In her 2010 evaluation, she opined that Claimant had an extreme limitation in attending and completing tasks, a marked and extreme limitation in health and physical well-being (due to his obesity), marked limitations in interacting and relating to others and caring for self, and a moderate limitation in acquiring and using information. Tr. at 436-440. In her 2011 evaluation, she opined that Claimant had an extreme limitation in attending and completing tasks and interacting and relating to others, a marked and extreme limitation in health and physical well-being and caring for self, and a moderate limitation in moving and manipulating objects (due to his inability to play sports). Tr. at 552-557. In her 2012 evaluation, she opined that Claimant had an extreme limitation in interacting and relating with others, and marked limitations in acquiring and using information, attending and completing tasks, caring for self and health and physical well-being, and a moderate limitation in moving and manipulating objects (attributed to his obesity). Tr. at 578-81.

-10-

### III.     STEPS TO DETERMINE WHETHER CHILD IS ENTITLED TO SSI

In order to qualify for childhood SSI benefits, a claimant must show that he or she has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and that is expected to cause death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.906.  An ALJ must proceed through the required sequential steps for evaluating entitlement to childhood SSI.  20 C.F.R. § 416.924(a).  The three-step procedure requires the ALJ to determine whether a child:

> (1) is performing substantial gainful activity;
>
> (2) has a "severe" impairment or combination of impairments; and
>
> (3) whether the impairment or combination of impairments are of listing-level severity in that the impairment(s) either meets, medically equals or are the functional equivalent in severity to an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing");

20 C.F.R. § 416.924(a)-(d).  In order to *meet* a Listing, the child's impairment(s) must be substantiated by medical findings shown or described in the listing for that particular impairment. 20 C.F.R. § 416.925(d)(emphasis added.  In order to *medically equal* a Listing, a child's impairment(s) must be substantiated by medical findings at least equal in severity and duration to those shown or described in the listing for that particular impairment.  20 C.F.R. § 416.926(a) (emphasis added.)  In order to *functionally equal* a Listing, the child's impairment(s) must be of listing-level severity; *i.e.*, it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a)(emphasis added.)

> The Commissioner assesses all relevant factors, including:
>
> (1) how well the child initiates and sustains activities, how much extra help he needs, and the effects of structured or supportive settings;
>
> (2) how the child functions in school; and
>
> (3) how the child is affected by his medications or other treatment.

20 C.F.R. § 416.926a(a)(1)- (3).  Further, in considering whether a child's impairment functionally equals the Listings, the Commissioner begins by evaluating how a child functions on a daily basis and in all settings as compared to other children of the same age who do not have impairments.  20 C.F.R. § 416.926a(b).

-11-

The Commissioner considers how a child's functioning is affected during his activities at home, school and in his community in terms of six domains:

> (i) acquiring and using information;
>
> (ii) attending and completing tasks;
>
> (iii) interacting and relating with others;
>
> (iv) moving about and manipulating objects;
>
> (v) caring for yourself; and,
>
> (vi) health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).

Lengthy definitions for "marked" and "extreme" are set out in § 416.926a(e. "Marked" limitation means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning expected on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. See § 416.926a(e)(2)(i). "Extreme" limitation is the rating for the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning that would be expected on standardized testing with scores that are at least three standard deviations below the mean. See 20 C.F.R § 416.926a(e)(3)(I).

An individual has a "marked" limitation when the impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation exists when the impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation may also seriously limit day-to-day functioning. *Id.*

If the child's impairment meets, medically equals, or functionally equals the Listing, and if the impairment satisfies the Act's duration requirement, then the child is considered disabled. 20 C.F.R. § 416.924(d)(1). If both of these requirements are not satisfied, then the child is not considered disabled. 20 C.F.R. § 416.924(d)(2).

IV.  **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997.   Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Id.*; *Walters,* 127 F.3d at 532.  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health and Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

V.  **RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ found that Claimant had the severe impairments of ADHD, oppositional defiant disorder ("ODD"), and morbid obesity, Tr. at  13, but his impairments did not meet or medically equal a listed impairment. Tr. at  14-20. The ALJ also found that Claimant's impairments did not functionally equal a listed impairment. Tr. at  14-26. The ALJ characterized Plaintiff's testimony as "generally credible,"Tr. at 18, despite the fact that she testified at the hearing that Claimant's behavior did not improve with medication and counseling, which contradict the medical evidence. The ALJ assigned great weight to the opinions of Drs. House and Rindsberg, the consultative examiners, as well as the state agency physicians and psychologists, all of which he opined were consistent with the medical evidence.  The ALJ assigned little weight to the opinion of Ms. Crowe-Carpenter because she was not an accepted medical source, and her opinions were inconsistent with the medical evidence in the record and "overly exaggerated." Tr. at 20.

-13-

Based upon Plaintiff's testimony and the evidence in the record, the ALJ determined that Claimant had a marked limitation in the domain of interacting and relating to others, based upon his defiant behavior, fights, and multiple suspensions from school. Tr. at 19, 21, 23. However, the ALJ found that Claimant did not have a marked limitation in any other domain. Tr. at 20-26. Therefore, Claimant was not disabled. Tr. at 26-27.

## VI.    ANALYSIS

Plaintiff asserts two argument in this appeal. First, Plaintiff argues that the ALJ provided insufficient analysis in support of his conclusion that Claimant's ADHD does not meet or equal Listing 112.11. Next, Plaintiff contends that the ALJ erred in concluding that Claimant does not have marked limitations in the domains of attending and completing tasks and caring for oneself.

### A.    "Meets or equals" analysis

The burden of proof at step three of the sequential entitlement to children's social security benefits rests with Plaintiff. *Franklin ex rel. L.F. v. Comm'r of Soc. Sec.*, No. 4:10CV2215, 2012 WL 727799, at *1 (N.D. Ohio Feb. 16, 2012), citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999. The ALJ must "nevertheless provide articulation of step three findings that will permit meaningful review of those findings." *Franklin*, citing *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006) and *Hunter v. Comm'r of Soc. Sec.*, No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011. "As a rule, the ALJ must build an accurate and logical bridge between the evidence and his conclusion." *Hernandez ex rel. L.A. v. Astrue*, No. 1:10CV1295, 2011 WL 4899960, at *6, citing *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011); *see also Wilson v. Comm'r of Soc.* Sec., 378 F.3d 541, 544-546 (6th Cir. 2004.

In *Reynolds v. Commissioner of Social Security*, 424 Fed. App'x 411 (6th Cir. 2011), the Sixth Circuit Court of Appeals reversed and remanded the case when the ALJ found that the claimant had severe physical and mental impairments at step two of the sequential analysis but failed to analyze the claimant's back impairment at step three despite concluding that his back impairment had failed to meet or equal a Listing. The Sixth Circuit observed that" '[n]o analysis whatsoever was done as to whether Reynolds' physical impairments (all summed up in his finding of a severe 'back pain'

-14-

impairment) met or equaled a Listing under section 1.00, despite his introduction concluding that they did not." *Id.* at 415.  The Sixth Circuit wrote:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence.

*Id.* at 416 [citations omitted].

Courts within this District have vacated and remanded cases pursuant to *Reynolds* where the ALJ provided only a conclusory statement and failed to conduct a meaningful step three analysis that compares the medical evidence to the applicable listing and provides an "explained conclusion" as to why a claimant's impairments failed to meet or equal a Listing.  *See e.g., Saleh v. Comm'r of Soc. Sec.,* 2013 WL 3421835, at *8 (N.D. Ohio July 8, 2013); *Waller v. Astrue,* 2012 WL 6771844 at *2–5 (N.D.Ohio Dec.7, 2012) *adopted,* 2013 WL 57046 (N.D.Ohio Jan.3, 2013); *May v. Astrue,* 2011 WL 3490186 at * 7–10 (N.D.Ohio June 1, 2011) *adopted,* 2011 WL 3490229 (N.D.Ohio Aug.10, 2011); *Keyes v. Astrue,* 2012 WL 832576 at * 5–6 (N.D.Ohio March 12, 2012); *Hunter v. Astrue*, 2011 WL 6440762 at * 3–4 (N.D.Ohio Dec.20, 2011); *Marok v. Astrue,* 2010 WL 2294056 at * 5 (N.D.Ohio June 3, 2010); *Hakkarainen v. Astrue*, 2012 WL 398595 at * 10–13 (N.D.Ohio Jan.19, 2012) *adopted* 2012 WL 396970 (N.D.Ohio Feb.7, 2012); *Shea v. Astrue,* 2012 WL 967088 at * 8–11 (N.D.Ohio Feb.13, 2012) *adopted* 2012 WL 967072 (N.D.Ohio March 21, 2012).  While no heightened articulation at step three is required, an ALJ must nevertheless articulate findings that will permit meaningful judicial review of his findings.  *Hunter v. Comm'r of Soc. Sec.*, No. 1:09CV2790, 2011 WL 6440762, at *3-4 (N.D. Ohio Dec. 20, 2011).

The ALJ concluded that Claimant does not have an impairment that meets or medically equals Listing 112.11. Listing 112.11, captioned "Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity," reads, in its entirety:

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Medically documented findings of all three of the following:

-15-

1. Marked inattention; and

2. Marked impulsiveness; and

3. Marked hyperactivity;

and

B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

The relevant sections of Listing 112.02, captioned "Organic Mental Disorders," read, in their entirety:

B. Select the appropriate age group to evaluate the severity of the impairment:

. . .

2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

-16-

Here, the ALJ expressly considered whether Claimant met or medically equaled Listing 112.11, separate and apart from his functional equivalence analysis, and determined that the evidence was not reflective of listing-level severity. Tr. at 14. The ALJ noted that none of the treating or examining physicians made the requisite findings, and then proceeded to discuss the medical evidence. Tr. at 14-20.

Significantly, Listing 112.11 requires medically documented findings and all of the state agency physicians, to whom the ALJ afforded great weight, considered Listing 112.11 and found that Claimant did not meet the criteria. Tr. at 19, 55-60, 68-74. The ALJ also afforded great weight to Dr. Rindsberg, who found Claimant had no difficulty in communication, and adequate concentration, persistence, and pace with medication. Tr. at 17, 19. Dr. Rindsberg also "saw no indication of serious underlying problems with attention or hyperactivity." Tr. at 483. The ALJ acknowledged that Dr. House found that Claimant's concentration and attention were mildly inconsistent but not limited, his pace was adequate, Claimant was able to complete tasks, and his speech was normal. Tr. at 16. Claimant's GAF score when he began treatment at Beech Brook was 50 (prior to medication and counseling), and Dr. House assessed a GAF of 52, indicating moderate symptoms. Tr. at 16. However, with treatment at Beech Brook, his GAF score rose to 70, indicating only mild symptoms. Tr. at 17. Therefore, the ALJ provided sufficient analysis, supported by substantial evidence in the record, that Claimant did not meet or equal Listing 112.11.

Even assuming *arguendo* that the ALJ had not set forth a sufficient discussion to allow for meaningful judicial review, which he did, there is no basis for remand because no reasonable fact-finder could find that there are "medically documented findings" sufficient to meet the listing criteria. *See Hufstetler v. Comm'r of Soc. Sec.*, No. 1:10CV1196, 2011 WL 2461339, at *10 (N.D. Ohio June 17, 2011)(An ALJ's failure to explain how she reached her step three meets or equals conclusion can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual matter in another manner.) Plaintiff's argument does not identify any medically documented findings of the listing criteria, does not reference a single medical opinion finding that Claimant met the criteria, and relies significantly on non-medical evidence. In essence, Plaintiff's argument

-17-

amounts to a functional equivalence argument, not an argument that there are medically documented findings meeting the listing criteria. Therefore, no reasonable fact-finder could conclude that Plaintiff met the listing, and even if the ALJ had not conducted a sufficient analysis, which he had, there would be no basis for remand.

Here, the ALJ provided sufficient analysis of his conclusion with respect to meeting or equaling a Listing. Accordingly, the Court finds that Plaintiff's argument predicated upon Listing 112.11 is not well taken.

### B. Functional equivalence

Plaintiff challenges the ALJ's determination with respect to two of the six domains – attending and completing tasks and the ability to care for oneself. Insofar as the ALJ has concluded that Claimant suffers from a marked impairment in his ability to interact and relate to others, Plaintiff need only demonstrate that Claimant suffers one additional marked impairment in order to receive SSI.

A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is "more than moderate" but "less than extreme." *Id* . "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*

Substantial evidence, particularly the medical opinions, supports the ALJ's determination that Claimant had a less than marked limitation in attending and completing tasks. As the fact-finder, the ALJ has the exclusive duty to evaluate the medical opinions. 20 C.F.R. § 416.927. Only treating source opinions that are "well supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record" are given "controlling weight." 20 C.F.R. § 416.927(c)(2). Opinions, including treating source opinions, which are not well supported or are inconsistent with the record, are given less weight. *Id.*

Significantly, every opinion from an acceptable medical source – Drs. House, Rindsberg, Haque, Rosenfield, and Cruz – supports the ALJ's finding that Claimant did not have a marked limitation in this domain. Although Ms. Crowe-Carpenter offered a contrary opinion, the ALJ

-18-

correctly noted that she was not considered an acceptable medical source because she was a nurse practitioner.  See *Dudich v. Colvin*, No. 12-2244, 2013 WL 5939775, at *10 (N.D. Ohio Nov. 5, 2013) (explaining that as non-acceptable medical sources, nurse practitioners are not entitled to controlling weight or deference as treating sources).

Of greater import, the other opinions and examination findings provide substantial evidence to support the ALJ's ultimate conclusion that Claimant did not have marked impairments in the domains of attending and completing tasks.  Dr. House found that Claimant's concentration was mildly inconsistent but not limited, his pace was adequate, and he was able to complete tasks.  Dr. Rindsberg found that Claimant's concentration, persistence, and pace were adequate with medication. During Dr. Rindsberg's examination, Claimant showed no sign of inattention or distractibility, and Dr. Rindsberg "saw no indication of serious underlying problems with attention or hyperactivity." Tr. at 484. Claimant was able to focus adequately for the evaluation, and there were "no difficulties with his ability to focus and remain attended to what he needed to focus on." Tr. at 484. Dr. Rindsberg explained that with medication, Claimant  was able to focus adequately. Tr. at 485.  Similarly, Drs. Haque, Rosenfield, and Cruz found that  Claimant's limitations in the domain of acquiring and using information were less than marked. Tr. at 432. Therefore, the opinion evidence alone provides substantial evidence to support the ALJ's finding that Claimant had less than marked limitations in this domain.

Furthermore, the medical records, Claimant's school records, and Plaintiff's own statements show that Claimant's attention and concentration improved with medication. Records from Beech Brook revealed Claimant showed "great" improvement with medication and was only "mildly" restless. Tr. at 17, 417, 455. With medication, Claimant's GAF score was 70, which indicates only mild limitations. Tr. at 17, 417. His multi-factor evaluation showed his scores were average for reading, mathematics, and written expression. Tr. at 15, 164-166.

Claimant had setbacks when his family moved, his parents took him off medication, or his parents did not increase his medication as directed.  Tr. at 445, 450, 452,463, 478. However, when he was on his medication and adjusted to his new schools, his behavior improved. In February of 2009, even after Claimant had a setback with increased aggression over a two-week period, his

therapist observed he was able to sit still and focus for appropriate periods of time. Tr. at 426. Similarly, Claimant had difficulty in the summer of 2010 when he was taken off his medication, there was a death in his family, and his family moved. Tr. at 445, 478. However, by November of 2011, Claimant improved, and Ms. Crowe-Carpenter found that his speech was normal, he was neither elevated or depressed, he was cooperative, and he followed instructions in an age-appropriate manner. Tr. at 442, 495, 541. In sixth grade, Claimant was performing at grade level and at the end of his sixth grade year, his Beech Brook ISP review showed that he improved, he was "doing well" in his new school, and making new friends in the neighborhood. Tr. at 336, 610.

Similarly, substantial evidence supports the ALJ's determination that Claimant had less than marked limitations in the ability to care for himself. This domain addresses the extent to which a child is able to care for his or her health, safety, and personal needs such as dressing, toileting, and bathing appropriately for his or her age. 20 C.F.R. § 416.926a(k)(1). Another consideration is whether the child is frequently ill. 20 C.F.R. § 416.926a(e)(2)(iv).

Dr. Haque found that Claimant had no limitation in caring for himself, and Drs. Rosenfeld and Cruz found that Claimant had less than marked limitations in that domain. Tr. at 57, 71, 433. Although Plaintiff reported she had to force Claimant to take baths, Tr. at 484, Dr. House observed that Claimant dressed appropriately and was in neat attire. Tr. at 397, and Dr. Rindsberg found that he was casually and fashionable attired, appropriate to the weather. Tr. at 482. Dr. Rindsberg noted that Claimant had a fair degree of concern for his appearance, and his grooming was appropriate. Tr. at 482. Similarly, Ms. Richard found that he was dressed appropriately and Ms. Crowe-Carpenter observed that Claimant was neatly dressed and groomed in an age-appropriate manner. Tr. at 541, 617. Ms. Thomas reported Claimant had good hygiene, Tr. at 337, and his mother explained he had a basic understanding of his own safety. Tr. at 258. His Beech Brook evaluators repeatedly noted no safety concerns. Tr. at 411, 480, 514, 539, 567, 611. Ms. Mitchell found that Claimant had only one serious problem and one very serious problem in this domain, but had no problem taking care of his personal hygiene, caring for his physical needs, using good judgment regarding personal safety and dangerous circumstances, or knowing when to ask for help. Tr. at 150. In addition, his medical records with Ms. Crowe Carpenter do not show chronic or frequent illnesses. Tr. at 441-71, 570-77.

Here, Plaintiff contends that evidence in the record, including the statements of Ms. Crowe-Carpenter and Claimant's teachers, supports a finding of marked limitations in the domains of attending and completing tasks and caring for oneself.  However, even if there is substantial evidence, or a preponderance of the evidence, to support the foregoing conclusions, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc .Sec.*, 336 F.3d 469, 477 (6th Cir.2003).  Additionally, in determining whether there is substantial evidence to support the Commissioner's decision, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir.1987).  A review of the record demonstrates that substantial evidence supports the ALJ's conclusion that Claimant does not suffer marked limitations in the domains of attending and completing tasks and caring for oneself.

### VII.    CONCLUSION

For the foregoing reasons, the decision of the ALJ is AFFIRMED and this case is DISMISSED with prejudice.

IT IS SO ORDERED.

DATE: February 13, 2015

    */s/George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE